## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL WIGGINS,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 20-5617** |
| | : | |
| **UNIVERSAL PROTECTION** | : | |
| **SERVICES,** *et al.*, | : | |
| **Defendants.** | : | |

### MEMORANDUM

**Goldberg, J.**                                              **February 17, 2022**

Plaintiff Michael Wiggins, acting *pro se*, brings this claim against Defendant Universal Protection Services, LLC alleging that he was discriminated against based on his gender. Defendant moves to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, I will grant the Motion.

## I.    FACTUAL BACKGROUND

The following facts are set forth in the Complaint.[1]

Plaintiff commenced his employment as a Security Officer at Crozer-Chester Medical Center ("Crozer"). On April 19, 2019, less than eight months into Plaintiff's employment, Crozer decided to outsource its security services to Defendant, a security firm. As a result, Plaintiff was no longer a direct employee of Crozer but rather was directly employed by Defendant and assigned to work at Crozer as a security guard. (Compl. p. 2.)

---

[1]    In deciding a motion under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief. Atiyeh v. Nat'l Fire Ins. Co. of Hartford, 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010).

Shortly thereafter, Plaintiff became co-workers with security officer Byhira Ayers, and the two established a "friendly working relationship" during which they "hung out, laughed, and had breakfast together."  The relationship was not romantic.  (Id.)

In early June 2019, Plaintiff was promoted to a part-time weekend supervisor, known as the Officer-in Charge, and the relationship changed between Plaintiff and Ayers.  According to Plaintiff, Ayers "launched a deliberate and malicious campaign to sabotage plaintiff's employment."  Plaintiff alleges that Ayer's actions were so severe and pervasive that Plaintiff had to file a formal complaint of harassment and hostile work environment against her.  (Id. pp. 22–3.)

A.    **Facts Underlying Plaintiff's Harassment and Hostile Work Environment Claim (Count I)**

According to Plaintiff, the first problematic incident occurred on June 7, 2019.  Plaintiff had just arrived home and noticed that Security Officer Lilyth Moreno had tried to reach him.  Plaintiff proceeded to return Moreno's call when Ayers, who was standing next to Moreno at the time, snatched the cell phone from Moreno, put it on speaker phone, began yelling at Plaintiff for leaving work for her to do, and repeatedly called Plaintiff a "straight girl" in front of the entire Crisis Unit.  Because of this incident, Plaintiff filed a Formal Complaint of harassment and hostile work environment against Ayers.  (Id. ¶¶ 2–3.)

Plaintiff also alleges that Ayers conspired with another female security officer, Shane Smith, to harass him.  Ayers boasted to Smith about her publicly berating Plaintiff and then encouraged Smith to do the same.  On June 10, 2019, just three days after the Ayers incident, Shane Smith walked into the security office and, in front of several security officers, began screaming and yelling at Plaintiff "to harass and undermine him."  (Id. ¶ 7.)

The second main incident occurred on June 15, 2019, when Plaintiff was in charge of the shift and noticed that two security officers were not on post.  Plaintiff instructed a third security

officer, who was driving the security vehicle, to transport both officers to their posts. Ayers, who was off-duty, interjected, stating "You ain't gotta listen to him. Where Bob (Birney) [a full-time supervisor] at?" Ayers then started to get into the security vehicle with the other officers, and Plaintiff instructed her not to. She got into the security vehicle anyway, locked the door from the inside, and refused to get out of the car. Other security officers in the vehicle began to follow Ayer's example and disrespect Plaintiff, thereby undermining his authority. (Id. ¶¶ 10, 12, 13.)

When Plaintiff returned to work the next morning, both the overnight shift and incoming day shift assembled around the Outpatient Registration desk and began to laugh at and mock Plaintiff. Full-time Supervisor, Michele Schade, stated to Account Manager Michael Buechler, "I saw them all out there laughing at him when he came in." (Id. ¶ 14.)

On April 20, 2018, Ayers continued to harass Plaintiff by submitting a written statement in which she referred to Plaintiff as "a lying pervert." Ayers then went on a smear campaign of Plaintiff's character. (Id. ¶ 16.)

Ultimately, based on Plaintiff's complaint to HR, Ayers received counseling for her actions and was ordered by HR to take a course on "Ethics and Conduct." (Id. ¶ 15.)

### B.    Facts Underlying Plaintiff's Gender Discrimination Claim (Count II)

Following Plaintiff's complaint to HR about Ayers, Account Manager Michael Buechler, who oversees security for Allied at Crozer, took Ayers off the schedule and removed her from the Crozer Account. The next day, however, Ayers levied an allegation of harassment and/or sexual harassment against Plaintiff, an allegation which was later investigated by HR and dismissed. Based on Ayers's initial allegations, however, Buechler reinstated Ayers. Buechler then conducted a meeting with Plaintiff, suspended him from the [Crozer] Account, and issued him a "Final Warning" disciplinary action. Buechler refused to allow Plaintiff to respond to Ayers' allegations and told Plaintiff, "I'm about to fire you right now." (Id. ¶¶ 21–24, 28.)

3

Plaintiff asserts that Ayers's complaint of harassment was motivated by retaliation against Plaintiff and for the sole purpose of getting her job back.  Ayers's complaint cited to texts from Plaintiff that were sent during the time that the two were friends and engaged in friendly exchanges. These texts were sent weeks prior, and Ayers did not file her complaint until *after* Plaintiff filed his complaint against her.  (Id. ¶¶ 36–37, 39–42.)

### C.   Facts Underlying Plaintiff's Retaliation Claim (Count III)

On June 17, 2019, Plaintiff filed a formal complaint of harassment and hostile work environment against Ayers.  Two days later, Defendant issued Plaintiff a disciplinary action for "Unprofessional Conduct" and removed Plaintiff from the Crozer account entirely.  (Id. ¶ 50.)

In his follow-up with HR, Plaintiff explained that Ayers was motivated by jealousy over Plaintiff's promotion to supervisor.  Plaintiff claims that he knows "for a certainty" that Ayers was also motivated to harass Plaintiff because of his gender based on the fact that: (a) Ayers called Plaintiff "a straight girl" in front of an entire Crisis Unit; (b) Ayers submitted a statement referring to Plaintiff as a "lying pervert"; and (c) Ayers conspired with another female Security Officer, Shane Smith, to harass Plaintiff.  (Id. ¶¶ 52–53.)

On June 19, 2019, Plaintiff commenced his shift, unaware that Ayers, just the day before, made the aforementioned "bogus" complaint of harassment and had been reinstated.  He was in the cafeteria when he saw Ayers—who he believed had been removed from the Account—in full uniform and working.  Plaintiff pulled aside 1st Shift Supervisor, Michele Schade, who was also in line at the cafeteria, and spoke privately with her about Ayers's presence.  Later that day, Buechler held a meeting with Plaintiff, at which time he made Plaintiff aware of Ayers's allegations, as well as his decision to remove Plaintiff from the Account.  Buechler also issued Plaintiff a Disciplinary Action for "Unprofessional Conduct" in which he gave Plaintiff a "Final Warning."  Buechler's

supposed reason for the Disciplinary Action is because Plaintiff had alleged said to Michele Schade that he wanted Ayers "the f**k gone," upon seeing that she had been reinstated. (Id. ¶¶ 56–60.)

During that same meeting, Buechler also asserted that Plaintiff acted unprofessionally and inappropriately regarding women aside from Ayers. Buechler referenced a "consensual, off-the-work site relationship with a female security officer named Sahar Muhammad," even though Plaintiff's promotion occurred after his brief relationship with Muhammad ended. Following the relationship, Muhammad submitted a statement in which she stated, "Security Officer Wiggins made me feel very uncomfortable he made advances that I didn't like nor feel comfortable with . . . I told him I was not attracted to him because he is old." According to Plaintiff, however, text messages show that Muhammad liked him. (Id. ¶¶ 64, 66–68.)

On July 7, 2019, Plaintiff sent HR employee O'Rourke an email titled "Libel/Defamation of Character" in which he attached the above-referenced text messages. Defendant took no action against Muhammad for submitting a false statement during a formal investigation. (Id. ¶¶ 69, 74.)

### D.        Facts Underlying Plaintiff's Harassment and Discrimination Claims (Count IV)

On June 20, 2019, the entire matter regarding both Plaintiff's and Ayer's complaints was turned over to HR for a full investigation and "trial-de-novo" in which a new set of investigators were to render a determination. Plaintiff contacted Buechler's boss, General Manager Al Santuosso, and requested his intervention. Santuosso, along with HR's Patrice O'Rourke, wound up being the two investigators assigned to the matter. (Id. ¶¶ 77–78.)

On July 3, 2019, Plaintiff was called to downtown headquarters for a "Formal Meeting" with Santuosso and O'Rourke, at which time Plaintiff's and Ayer's allegations were discussed at length. At the conclusion of the Formal Meeting, O'Rourke stated to Plaintiff that "we will get back to you by Wednesday (7-10-19)" regarding their determination. When Plaintiff did not hear anything by then, he emailed Santuosso and inquired as to the status. (Id.) Santuosso never responded to the

email, contrary to his prior practice of responding to all of Plaintiff's correspondence.  (Id. ¶¶ 81–83.)

On Friday, July 12, 2019, O'Rourke contacted Plaintiff and scheduled a phone conference for that upcoming Monday to discuss the investigation results.  During that phone conference, O'Rourke informed Plaintiff that the investigation was inconclusive as to Ayers's complaint of harassment.  Nevertheless, Plaintiff was not returned to his account and was, instead, reassigned.  Moreover, O'Rourke upheld Buechler's disciplinary action of a "Final Warning," resulting in Plaintiff's demotion and loss of seniority.  O'Rourke offered no explanation for the reassignment and stated, "We'll find another Account for you to work at."  As to Ayers, O'Rourke indicated, "Well, we're going to keep her there [at the Account]."  (Id. ¶¶ 84, 88–90, 92–93, 96.)

In her investigation, O'Rourke obtained witness statements from women only, even though two male Security Officers could have given statements regarding the second incident described above.  Moreover, according to Plaintiff, O'Rourke never fully investigated Plaintiff's allegations regarding when Ayers snatched Security Officer Moreno's phone and called Plaintiff a "straight girl" in front of a whole unit.  Plaintiff admits that O'Rourke obtained a witness statement from Moreno, but claims that Moreno's statement did not elaborate on the conversation between Plaintiff and Ayers.  (Id. ¶¶ 105–108.)

Finally, Plaintiff asserts that only he was ordered to report to downtown headquarters, placed on the hot-seat, and subjected to an interrogation.  Ayers did not have to report downtown.  (Id. ¶¶ 115–116.)

### E.    Facts Underlying Plaintiff's Claim of Constructive Discharge (Count V)

Plaintiff claims that he made Defendant aware that he was being subjected to conditions of discrimination when he submitted his two formal complaints against Ayers and Smith.  Plaintiff's removal from the Account, however, resulted in an "undeserved stigma of sexual harassment"

attached to his name.  Therefore, even if reinstated, Plaintiff alleges that he would have been too uncomfortable and humiliated to remain employed with Defendant.  Accordingly, Plaintiff contends that he was forced to resign.  (Id. ¶¶ 122–125.)

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and only a complaint that states a plausible claim for relief survives a motion to dismiss.  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id. at 679.

The Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard.  Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014).  First, the court outlines the elements a plaintiff must plead to state a claim for relief.  Id. at 365.  Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth."  Id.  Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'"  Id. (quoting Iqbal, 556 U.S. at 679).  The last step is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. (quoting Iqbal, 556 U.S. at 679).

A *pro se* complaint should be "held to less stringent standards than formal pleadings drafted by lawyers." U.S. ex rel. Walker v. Fayette Cnty., Pa., 599 F.2d 573, 575 (3d Cir. 1979), (citing Haines v. Kerner, 404 U.S. 519, 521 (1972)).  The court must construe the facts stated in the complaint liberally in favor of the plaintiff.  Haines, 404 U.S. at 520.  "Yet there are limits to our procedural flexibility.  For example, *pro se* litigants still must allege sufficient facts in their complaints to support a claim." Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013).  Thus, even a *pro se* complaint must conform with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure, which "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" or "naked assertions" that are devoid of "factual enhancement." Iqbal, 556 U.S. at 678 (internal quotations omitted).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' will not do." Id.

## III.   DISCUSSION

Defendant moves to dismiss all of Plaintiff's claims.  In response, Plaintiff contends that the Motion is barred by collateral estoppel, and that, in any event, his claims are adequately pled.

### A.   Whether the Motion to Dismiss is Barred by Collateral Estoppel

Plaintiff first asserts that Defendant's Motion to Dismiss is barred by collateral estoppel. Specifically, in conjunction with the filing of his Complaint, Plaintiff sought leave to proceed *in forma pauperis*.  Under 28 U.S.C. § 1915(e)(2)(B)(ii), where a claim is filed *in forma pauperis*,  the court may review that complaint *sua sponte* to determine whether it fails to state a claim upon which relief may be granted.  Id.  When conducting that review, I found that Plaintiff's claims against several individual defendants were not plausible and were subject to dismissal with prejudice.  I permitted the remainder of the claims to go forward.  Plaintiff now contends that by not addressing and/or dismissing the remaining claims—those brought against Universal—I already ruled that

those claims state plausible causes of action.  In turn, Plaintiff presses that the Motion to Dismiss under Rule 12(b)(6) is barred by the doctrine of collateral estoppel.

Plaintiff's argument is misplaced.  My screening of Plaintiff's Complaint occurred pursuant to the Court's authority under § 1915A, which is applicable at the initial stage of litigation.  See 28 U.S.C. § 1915A.  A court's initial review, and acceptance, of a complaint during the § 1915A "screening" does not preclude a later dismissal of that complaint under Fed. R. Civ. P. 12(b)(6).  Rather, a defendant retains the right to file a well-reasoned and supported motion to dismiss, which may be granted upon consideration of all arguments by the parties.  See Muhammad v. Court of Common Pleas of Allegheny Cnty., Pa., No. 09-1255, 2011 WL 4368394, at *4 (W.D. Pa. Aug. 25, 2011), vacated in part on other grounds 483 F. App'x 759 (3d Cir. 2012); Everett v. Dykes, No. 20-cv-309, 2021 WL 4148068, at *2 (E.D. Ark. Sept. 13, 2021); Mendez v. Moonridge Neighborhood Assoc., Inc., No. 19-cv-507, 2021 WL 276694 (D. Idaho Jan. 26, 2021); Morales v. Cnty. of Westchester, No. 97-cv-498, 1997 WL 32985, at *2 (S.D.N.Y. Jan. 23, 1997).  The doctrine of collateral estoppel has no applicability here.

### B.    Harassment/Hostile Work Environment Claim

Defendant first seeks dismissal of Plaintiff's claim in Count I for harassment/hostile work environment.

The United States Supreme Court has explained "[w]orkplace conduct is not measured in isolation," so when a workplace "is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001), and Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Under the hostile work environment framework, a plaintiff must prove that (1) she suffered intentional discrimination

because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.  Id.  In other words, a "severe and pervasive" hostile work environment is substituted in place of a materially adverse employment action. See Hare v. Potter, 220 F. App'x 120, 131–32 (3d Cir. 2007); Komis v. Perez, No. 11-cv-6393, 2014 WL 3437658, at *2 (E.D. Pa. July 15, 2014).

"The inquiry into whether the discriminatory or retaliatory environment was 'severe or pervasive' recognizes that less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus, and one severe incident may be enough to create a hostile work environment."  Komis v. Sec'y of U.S. Dept. of Labor, 918 F.3d 289, 293-94 (3d Cir. 2019).  "To judge whether such an environment is hostile or abusive, [a court] must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. at 271.

Where the hostile work environment is perpetrated by co-workers rather than supervisors, the Third Circuit has made clear that "[a]n employer may be liable under Title VII for retaliatory harassment only if the *prima facie* case is satisfied and if there is a basis for employer liability for the co-worker's conduct."  Moore v. City of Phil., 461 F.3d 331, 349 (3d Cir. 2006).  "There is such a basis for liability where supervisors 'knew or should have known about the [co-worker]

harassment, but failed to take prompt and adequate remedial action' to stop the abuse." Id. (quotation omitted).

Here, Plaintiff's hostile work environment claim is premised on two limited incidents. According to the Complaint, the first incident occurred on June 7, 2019, when Ayers grabbed the phone from a co-worker, put Plaintiff on speaker phone, yelled at him, and called him a "straight girl" in front of the entire Crisis Unit. Ayers later filed a complaint and referred to Plaintiff as a "lying pervert." The second incident occurred on June 15, 2019, when Ayers told two employees, who Plaintiff supervised, that they did not need to listen to him. Ayers then disobeyed Plaintiff's directive and got into a security vehicle. This incident resulted in co-workers laughing at him.

Plaintiff's hostile work environment claim fails in two respects. First, nothing in Plaintiff's Complaint suggests severe or pervasive harassment. Indeed, both incidents were isolated and sporadic, having been perpetrated by the same co-worker within a one week time frame. From an objective perspective, the incidents were not so serious as to render his work environment intolerable. Rather, such events, while perhaps embarrassing or annoying, constituted nothing more than "offhand comments" and "isolated events" that do not give rise to a hostile work environment claim. See Canada v. Samuel Grossi & Sons, Inc., 476 F. Supp. 3d 42 (E.D. Pa. 2020) (holding that "[f]or racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments." (quotation omitted)). Plaintiff's subjective embarrassment is insufficient to elevate Ayers's conduct to the level of "severe and pervasive." See Ulrich v. U.S. Sec'y of Veterans Affairs, 457 F. App'x 132, 140 (3d Cir. 2012) (holding that it is not enough that "the employee subjectively perceives [the environment] as abusive or hostile[,] rather the environment must be one "a reasonable person would find hostile or abusive.").

Moreover, Plaintiff has not connected any of these comments to gender animus.  See Abramson v. William Paterson Coll. of N.J, 260 F.3d 265, 278 (3d Cir. 2001) (noting that to succeed on a hostile work environment claim, a plaintiff must plausibly plead discriminatory animus).  Although Plaintiff urges that Ayers's insults of calling him a "straight girl" and "lying pervert" constitute direct evidence of harassment based on his gender, no rational reading of these slurs suggests that they were premised on actionable gender discrimination.  Nor does the mere fact that Ayers and Smith were female amount to a presumption that their actions towards Plaintiff were motivated by gender.

Accordingly, I will dismiss this claim.

**C.**   **Gender Discrimination Claim**

To establish a claim of discrimination, a plaintiff must show that an employer had a racially discriminatory animus against an employee, and that the animus resulted in a challenged action, such as dismissal, failure to promote, or failure to hire.  Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983).  A plaintiff may succeed in a discrimination claim against an employer either by (1) providing direct evidence of unlawful discrimination, or (2) relying on indirect evidence of discrimination through the McDonnell Douglas burden-shifting scheme.  McIlvaine v. ISEO Techs., Inc., 485 F. Supp. 3d 582, 585 (E.D. Pa. 2020) (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999)).

Absent direct evidence of discrimination, a plaintiff must rely on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff must prove, by a preponderance of evidence, a *prima facie* case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  To establish a *prima facie* case of racial discrimination, a plaintiff must show that he (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an

adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410–11 (3d Cir. 1999).

To adequately plead an inference of discrimination under the fourth element, a plaintiff must allege facts upon which a "court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons."  Equal Employment Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990).  One way that a plaintiff can create such an inference is by asserting that he was treated less favorably than similarly situated employees outside of the protected class.  Jones, 198 F.3d at 413.  While "similarly-situated" does not necessarily mean identically situated, the plaintiff must nevertheless be similar in "all relevant respects."  Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222–23 (3d Cir. 2009) (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)).  Demonstrating that employees are similarly situated often includes a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  Opsatnik, 335 F. App'x at 223 (quotations omitted).  Alternatively, a plaintiff may "rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action."  Greene v. Virgin Islands Water & Power Auth., 557 F. App'x 189, 195 (3d Cir. 2014).

Here, Plaintiff alleges that he and Ayers filed complaints against each other with HR. Although Ayers was initially suspended, she was reinstated, and Plaintiff was suspended pending investigation.   Ultimately, HR found no basis to Ayers's complaint, but Plaintiff remained suspended from working at Crozer while Ayers continued working there.  Plaintiff claims that this disparate treatment between him and a female colleague exhibits gender discrimination.

Such allegations fail to establish the fourth element of a *prima facie* case as the circumstances of the adverse employment action do not give rise to an inference of discrimination. No circumstantial evidence connects the adverse employment action with Plaintiff's status as a male. Plaintiff's simple speculation that Defendant's "decision to suspend plaintiff from Crozer while allowing Ayers to continue to work was based solely on gender" fails to create any plausible inference of gender animus. (Pl.'s Resp. 7)

Likewise, I do not find that Ayers's more favorable treatment than Plaintiff establishes gender animus. Ayers is not a proper comparator since, by Plaintiff's own admission, he was a supervisor and Ayers was not.[2] See Mays v. PNC Bank, 434 F. Supp. 3d 284, 297 (E.D. Pa. 2020) ("Where a proposed analog is a subordinate, this Court has previously found that such an employee is generally not a proper comparator."). Moreover, according to Plaintiff's own allegations, Plaintiff had additional disciplinary problems beyond those alleged by Ayers, including: (a) a complaint by Security Officer Muhammad for alleged inappropriate conversations with and harassment of her, and (b) Plaintiff's incident of anger upon seeing Ayers reinstated and in the cafeteria on June 19, 2015. Plaintiff sets forth no facts suggesting that Ayers had engaged in similar inappropriate behavior. Finally, the Complaint expressly states that Ayers was in fact disciplined for her actions— albeit in a different manner than Plaintiff—as she "received counseling" and was "ordered by HR to take a course on 'Ethics and Conduct' based on Plaintiff's complaint." (Compl. ¶ 16.) As such,

---

[2] Plaintiff emphasizes that he never had any supervisory authority over Ayers, but rather was an Officer-in-Charge, which is lower ranked than an actual supervisor. This argument, however, still fails to establish Ayers as an actual comparator. Regardless of Plaintiff's supervisory authority over Ayers, the fact remains that Plaintiff had the promotional title of "Officer-in-Charge" and was "in charge of overseeing the shift, absent an actual supervisor." (Pl.'s Resp. Opp'n 6.) His Complaint specifically alleges that he was a "Security Supervisor and Security Professional." (Compl. ¶ 18.) Moreover, Plaintiff repeatedly alleges throughout the Complaint that Ayers's harassment of him was directly because of his promotion to a supervisory position. (See Id. at p. 2 & ¶¶ 9–10.)

14

Plaintiff has not plausibly alleged that he and Ayers were similarly situated for purposes of establishing discrimination.

Absent any facts on which to premise an inference of unlawful discriminatory animus, I must dismiss this claim.

### D.    <u>Retaliation Claim</u>

Defendant next seeks dismissal of Plaintiff's claim of retaliation.  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  <u>Nelson v. Upsala Coll.</u>, 51 F.3d 383, 386 (3d Cir. 1995).  If the employee establishes this *prima facie* case of retaliation, the familiar <u>McDonnell Douglas</u> approach applies in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500–01 (3d Cir. 1997).

For purposes of the first prong of a *prima facie* case of retaliation, protected "opposition" activity includes not only an employee's filing of formal charges of discrimination against an employer but also "informal protests of discriminatory employment practices, including making complaints to management."  <u>Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.</u>, 450 F.3d 130, 135 (3d Cir. 2006) (quoting <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990)).  That is, in determining whether a plaintiff adequately opposed discrimination, "we look to the message . . . conveyed [by a plaintiff's conduct] rather than the means of conveyance."  <u>Moore</u>, 461 F.3d at 343 (quoting <u>Curay–Cramer</u>, 450 F.3d at 135).  The opposition must be to discrimination based on a protected category, such as age or race.  <u>Daniels v. Sch. Dist. of Phila.</u>, 776 F.3d 181,

193 (3d Cir. 2015).  Furthermore, in making the opposition, the plaintiff must have an "objectively reasonable belief" that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute.  Id. at 193–94.  Stated differently, "if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected."  Wilkerson v. new Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008).

Here, Plaintiff's Complaint attaches the grievances that he filed with Defendant against both Ayers and Smith.  The claim of harassment against Ayers states:

> Dear Mr. Buechler,
>
> Please allow this letter to serve as my formal Complaint of Harassment and creating a Hostile Work environment perpetrated against me by Security Officer Byhira Ayers.
>
> **BACKGROUND**
>
> My work relationship with S/O Ayers started as me serving as her training officer.  As her training officer I went above and beyond to make sure that she was properly trained in how to inventory and log patient belongings.  This "extra mile" included me creating mock up patient belonging bags when there were no searches or Crises admissions so that she could see how an inventory was to be done. She was able to carry these mock up searches that I labeled "Joe Schmoe" as a cheat sheet or guidance in case she ever got confused. Also, on her second day at Crises (date unknown) she had to work as Unit 6 by herself, which I knew that she was not prepared to handle. Thus, I spent the entire shift from my own duties as unit 5-2 helping her log patient belongings, which I did not have to do.  Therefore, her criticism of me leaving work for her to do is baseless and unfounded.
>
> **Incident #1**
>
> On Friday 6-7-19 I was working as Unit 6 when I got 3 back to back safety searches right toward the end of my shift.  I completed the most voluminous one which took me to 2:00 and left the two easiest searches which were only PP clothing bags in that they had no valuables.

16

This happens sometimes, in that I have gotten stuck with far more than that.

Nevertheless, upon arriving home I noticed that both Ayers and S/O Lilith Moreno had called while I was driving home  So, I proceeded to return Moreno's call.  S/O Ayers was my relief at Crises that day and Moreno was Unit 14, and both were in Crises when I returned Moreno's call.

S/O Ayers proceeded to take the phone as I was calling her and **PUT IT ON SPEAKER** in front of the entire Crises staff, including the doctors and began screaming and yelling at me in front of everyone. She also tried to insult my manhood by saying "dude, you sound like a straight girl."

I also do not see any basis for this categorization.

In any event, there is no reason to put someone ON SPEAKER unless it is your deliberate attempt to humiliate, degrade, undermine, and harass someone.

It is not coincidental that 3 days later on 6-10-19 S/O Shane Smith walked into the security office and perpetrated the exact same offense as Ayers had done just days before.  S/O Smith was clearly inspired by S/O Ayers.  S/O Ayers has not only sought to create a hostile environment within her own action, but has instigated, incited and inspired others to do the same.

**Incident #2**

On Saturday 6-15-19 I was OIC for 2nd shift.  S/O Kalimah Abdullah, who reported to work 25 minutes late at 2:25, was scheduled to work post at North Campus lobby.   S/O Kane was doing a double, continuing his duties as Unit 20 on the round floor of North Campus. However, it was while in the Security office at 2:25 p.m. that I noticed both North Campus officers there instead of on post and I addressed the issue instructing S/O Allen-Cooley, who was 5-2 to drive both officers to North Campus, in which he did.

S/O Byhira (Ayers), whose duty had concluded 25 minutes earlier at 2:00, and who had absolutely nothing to do with the situation began instigating matters once again stating "You ain't gotta listen to him. Where Bob (Birney) at."  S/O Byhira then proceeded to get into the car with the other 3 officers that were en-route to North Campus, which I ordered her not to do.

Aside from being off-duty I did not want the disruptive presence of her in the car with the rest of the officers who were working.  Yet, Ayers refused to get out of the car and locked the door from the inside. S/O Moreno stated to me "Now Kane is starting to get smart with me and he never did this before.  Byhira started all of this.  She has single-handedly created all of this."

S/O Byhira Ayers is a cancerous tumor and her diseased attitude and professionalism is wide-spread and infecting the entire Department, both 1st and 2nd shift.  Ms. Ayers has deliberately and maliciously created a hostile work environment for me and it is my desire that she be removed from the account in her entirety.

(Compl. Ex. A.)

The complaint of harassment against Shane Smith stated:

On Monday, 6-10-19 at around 1:30 p.m. I, Michael Wiggins was assigned the 5-2 post when I was dispatched to do a transport from the ED room 3 to Crises.  S/O Shane Smith was working as Unit 22 and was asked to assist, because the patient was a 3-0-2.

The patient that myself and S/O Shane transported had a small amount of personal belongings consisting of clothing an no valuables making the inventory easy in that it required only a PP bag, which I had every intention of completing.  I was scheduled to do a double that day as Unit 6 second shift and had more than enough time to complete the inventory.  However, the patient was transferred to another facility, which eliminated the need to inventory the patient's belongings.

Nevertheless, S/O Smith took it upon herself to create the search sheet and inventory the belongings (which she did so incorrectly) despite the fact that there was absolutely no need whatsoever for her to do so. Also, while S/O Smith was still in Crises (2) C-43 Safety Searches arrived that Unit 6 was dispatched to do.  Anthony Rivera was Unit 6 on 1st Shift on the day in question.

S/O Smith, once again, took it upon herself to do the safety search and inventory the patient's belongings that was, once again, unnecessary in that one of the patients was not admitted at all.  A female patient of Indian descent (name unknown) was there on her own recognizance and released shortly thereafter.  Nevertheless, the work that she did unnecessarily was that of Unit 6.  I was 5-2, therefore she completed absolutely no work for me whatsoever.

Yet, at the end of the shift S/O Smith came storming in to the office an created a scene during shift change, among other things yelling

"You left all that paperwork there for me to do!   You need to start
doing your job!"

I greatly resent these remarks in that aside from the Supervisors, who
carry a great workload, no other regular officer had done more work
in the Security Department than me.   The changeover from Crozer
Security to Allied has created a great reduction in manpower, both
before and after.   I have been a constant factor in not only attendance,
but in performance, many time conducting both 6 and 5-2 duties
simultaneously, by myself, with only a Supervisor as backup.

I will not have my efforts undermined by the likes of S/O Smith.
What is most perplexing is that Smith never volunteers to do extra
work any other time, yet was so zealous on that day—and she used
that as an opportunity to start trouble and create a scene at my
expense.

This will not be tolerated, and I requested that S/O Smith receive
formal disciplinary action in that this sort of behavior, especially from
some of these younger female security officers, is becoming far too
frequent an occurrence.

(Id.)

Notably absent from these complaints is any clear opposition to discrimination based on a

protected category such as gender.   Rather, drawing all inferences in Plaintiff's favor, these

documents simply reflect a grievance that other security officers were being insubordinate and

disrespectful.   Plaintiff's simple reference to "female" guards in his Smith complaint is insufficient

to trigger Title VII concerns.   No reasonable person could have believed that the underlying

incidents described violated Title VII's standard for unlawful discrimination.   Similarly, nothing in

these letters suggests Plaintiff's objectively reasonable belief that the activity he opposed constituted

unlawful discrimination.   Accordingly, Plaintiff cannot establish a *prima facie* case of retaliation.[3]

---

[3]      Plaintiff contends that Defendant has articulated no legitimate business reason for the
adverse employment action against him.   Defendant's obligation to articulate such a reason is not
triggered until Plaintiff adequately pleads a *prima facie* case.

E.   <u>**Harassment and Discrimination (Count IV)**</u>

In Count IV, also entitled "Harassment and Discrimination," Plaintiff challenges the handling of his complaint against Ayers by Defendant's Human Resources Department.  As set forth above, both Ayers's and Plaintiff's complaints were transferred to HR for full investigation. Defendant's employees Santousso and O'Rourke were the investigators.  Following a formal meeting with Plaintiff, O'Rourke indicated that the investigation was inconclusive as to Ayer's complaint of harassment, but that HR would uphold the disciplinary action against Plaintiff due to his improper communications with another female security officer.  Plaintiff was returned to his undesired assignment, was demoted, and lost his seniority.  Plaintiff contends that Santuosso and O'Rourke only obtained witness statements from women and never called Ayers downtown for a meeting/interrogation, even though there were male witnesses present for one of the events.  Plaintiff contends that these events establish a *prima facie* case of discrimination based on gender because he is a male, he was qualified for his position, he was removed from his supervisory position and the Account, and Ayers—a female who created the hostile work environment—was treated more favorably in that she was allowed to remain on the Account.

Plaintiff's mere subjective belief that Ayers should have been disciplined for her actions and he should have been exonerated is an insufficient basis on which to state a harassment/ discrimination claim.  "Title VII does not permit courts to second-guess personnel decisions, but rather requires the Court investigate for a discriminatory animus."  Skrocki v. Carpenter Tech. Corp., No. 05-cv-5926, 2007 WL 1002122, at *5 (E.D. Pa. Mar. 30, 2007).  Moreover, nothing in the Complaint suggests that any decisions were made or actions were taken premised on Plaintiff's status as a male, particularly in light of the fact that the two investigators were of opposite genders. I will therefore dismiss this claim.

F.   <u>**Constructive Discharge**</u>

In Plaintiff's final cause of action, entitled "constructive discharge," he claims that he made Defendant aware that he was being subjected to conditions of discrimination by submitting two formal complaints against Ayers and Smith.   Plaintiff's removal from the Account, however, resulted in an "undeserved stigma of sexual harassment" attached to his name.   Therefore, even if reinstated, Plaintiff contends that he would have been too uncomfortable and humiliated to remain employed with Defendant.   Accordingly, Plaintiff contends that he was forced to resign.   (<u>Id.</u> ¶¶ 122–125.)

This claim cannot stand on its own.   "[C]onstructive discharge is merely a form of adverse employment action, and is not an independent claim."   <u>Matos v. PNC Fin. Servs. Grp.</u>, No. 03-cv-5320, 2005 WL 2656675, at *8 (D.N.J. Oct. 17, 2005) (citing <u>Knabe v. Boury Corp.</u>, 114 F.3d 407 (3d Cir. 1997) ("Knabe's constructive discharge claim, as presented here, is not a separate ground for relief.")); <u>see also</u> <u>Gilbert v. Phila. Media. Holdings LLC</u>, 564 F. Supp. 2d 429, 441 n.2 (E.D. Pa. 2008) (dismissing claim of constructive discharge because it is not an independent claim).

IV.   **CONCLUSION**

Having taken all of the Complaint's factual allegations as true and in the light most favorable to Plaintiff, I find that Plaintiff has failed to state a cognizable claim for relief against Defendant. Nevertheless, I remain cognizant that a court must allow a *pro se* plaintiff to leave to amend his or her complaint unless it would be inequitable or futile to do so. <u>Phillips v. Cnty of Allegheny</u>, 515 F.3d 224, 245 (3d Cir. 2008); <u>Alston v. Parker</u>, 363 F.3d 229, 235 (3d Cir. 2004).

Having carefully reviewed Plaintiff's thoroughly-detailed Complaint and his attached exhibits, I find that amendment of his claims would be futile.   The dismissal of the Complaint does not rest on an absence of adequately-pled facts, but rather on the inability of those facts to set forth plausible causes of action.   Plaintiff's hostile work environment claim does not legally rise to the

level of severe or pervasive discriminatory behavior.  Plaintiff's retaliation claim is based entirely on two complaints to Human Resources, neither of which constitute protected activity.  Plaintiff's gender discrimination claims set forth in Counts II and IV provide no suggestion, let alone a plausible inference, that any gender-based animus was involved.  Finally, Plaintiff's separate cause of action for constructive discharge is not legally cognizable.  Accordingly, I will dismiss these claims with prejudice.

An appropriate Order follows.